Page 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

BEKA ONE, LLC, )
)
Plaintiff, )
) CIVIL ACTION NO.
vs. ) 5:23-cv-64
)
RLI INSURANCE COMPANY, )
)
Defendant. )

* * * * * * * * * * * * * * * * * *

DEPOSITION OF
MONA INEZ GARCIA
October 24, 2023

* * * * * * * * * * * * * * * * * *

DEPOSITION OF MONA INEZ GARCIA having been duly sworn by CANDICE EDWARDS, Notary Public in and for the State of Texas. The witness appeared remotely in Dallas, Texas, at 10:00 a.m., pursuant to Texas Rules of Civil Procedure and any provisions stated on the record or attached hereto.

Page 2

APPEARANCES OF COUNSEL

On behalf of Plaintiff Beka One, LLC:
JACOB LANGLEY, ESQ.
ZERBE MILLER FINGERET FRANK & JADAV, PC
3009 POST OAK BOULEVARD
SUITE 1700
HOUSTON, TEXAS 77056
(713) 350-3529
jlangley@zmflaw.com

On behalf of Defendant RLI Insurance Company:
RICHARD LEE SMITH, ESQ.
QUILLING SELANDER LOWNDS WINSLETT & MOSER
2001 BRYAN STREET
SUITE 1800
DALLAS, TEXAS 75201
(214) 871-2100
rlsmith@qslwm.com

Also Present:
Michael Bender, Videographer
Priscilla Aguilar

Page 3

INDEX TO EXAMINATION


| EXAMINATION | PAGE |
|---|---|
| Examination by Mr. Smith | 4 |


INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notes | 45 |
| Exhibit 2 | 2020 Invoices and Pics | 48 |
| Exhibit 3 | 2021-2023 Emails Mona | 51 |
| Exhibit 4 | Email | 54 |
| Exhibit 5 | Notice of Subpoena | 57 |
| Exhibit 6 | Portal Text Messages | 64 |
| Exhibit 7 | Portal Text Message History | 64 |
| Exhibit 8 | Roof Repairs | 80 |
| Exhibit 9 | BBG Assessment | 83 |


(Exhibits 1 through 9 were attached to the original transcript.)

Page 4

THE VIDEOGRAPHER: Good morning. We are now on the record. The current time is 10:00 a.m. Today's date is October 24th, 2023. This begins the videotaped deposition of Mona Garcia in the matter of Beka One, LLC, versus RLI Insurance Company. The case number is 5:23-CV-64. My name is Michel Bender, I'm your remote videographer, and your court reporter is Candice Edwards.
Counsel, will you please introduce yourselves and the witness will be sworn.
MR. LANGLEY: This is Jacob Langley for the plaintiff Beka One, LLC.
MR. SMITH: Richard Smith for Defendant RLI Insurance Company.
THE REPORTER: Would you please raise your right hand?
MONA INEZ GARCIA,
having been first duly sworn, testified as follows:
THE WITNESS: Yes.
THE REPORTER: Thank you. Counsel, you may begin.
EXAMINATION
BY MR. SMITH:
Q. Good morning. My name is Richard Smith. I represent the defendant RLI Insurance Company in this



EXHIBIT E

Page 5

lawsuit that was filed by the plaintiff Beka One, LLC, related to their insurance claim for storm damage to the property at 903 East Bitters Road in San Antonio, Texas. Do you understand who I am and who I represent?
A. Good morning. Yes.
Q. Okay, very good. Thank you very much for being here today. Will you please state your full name for the record?
A. Yes. It is Mona Garcia.
Q. Do you have a middle name?
A. Inez, I-N-E-Z.
Q. Okay, thank you. Have you ever given a deposition before?
A. I have not.
Q. All right. Well, let's go over a few ground rules. It's via Zoom, so it's very easy to talk over each other, but let's do the best we can to create a clear record for the court reporter. I will wait till you're finished answering my question before I ask another questions and I'll ask that you wait till I'm finished asking my question to answer. Fair enough?
A. Fair enough.
Q. Okay. If you need a break any time, that's fine. Just let me know and we can take a break. The

Page 6

only thing that I ask is that you answer the outstanding question before we take a break. Okay?
A. Understood.
Q. All right. And lastly, this is a deposition, but it's the same effect as if you were testifying live in court under oath under the penalty of perjury. Do you understand that?
A. Understood.
Q. All right. Let's get started then. I introduced myself and told you which lawsuit this was about, about Beka One's property at 903 East Bitters. Are you familiar with this lawsuit and the subject matter of the lawsuit?
A. Yes, I am.
Q. All right. And I take it that you are also familiar with Beka One's property at 903 East Bitters Road, correct?
A. That's correct.
Q. All right. And are you familiar with the storm that is the subject matter of the lawsuit?
A. Yes, I am.
Q. Okay. Do you know when that storm occurred?
A. Yes.
Q. When was it?
A. Approximately May of 2020.

Page 7

Q. Okay. So I know it was a long time ago, over three years, but I'm here to ask you some questions about what you remember about the storm, what you remember about roof damage to the property, other damage to the property that might have occurred after the storm or before the storm. So I know it was a long time ago. That said, you know, I don't expect you to remember everything. Obviously, you know, details are difficult to remember last week, and this was three years ago. So, you know, I'm not trying to trick you, I'm not trying to get you slip up or anything like that. And I might bring up documents from time to time to jog your memory about something to see what you can tell me about it. Okay?
A. Makes sense.
Q. All right. Did you do anything to prepare for the deposition today?
A. Just provide the documents that you guys requested.
Q. Okay.
A. That was a couple months ago.
Q. Right. I think that was probably sometime in maybe -- I can't remember. Maybe it was in the summer sometime that you provided those documents? A few months ago, correct?

Page 8

A. Correct.
Q. All right. Did you speak with anyone in advance of this deposition about the deposition?
A. Yes.
Q. Who did you speak with?
A. I spoke with the current landlord, Brad, just to let him know, you know, that I had been asked about the -- to attend this deposition and want -- you know, wanted to make sure that I was supposed to -- you know, I needed to get his permission. I mean, that's typically what we do is make sure that, you know, that ownership knows that we're going to be attending these things.
Q. And that's Brad Baheri?
A. Yes, correct.
Q. Who is the -- I guess the property owner. He is in charge of Beka One, LLC?
A. Yes, that's correct.
Q. Did you speak with anyone else besides Brad Baheri?
A. Yes. I spoke with the -- I guess Brad's attorney.
Q. Okay. Who did you speak with?
A. I think it was actually Jacob yesterday.
Q. All right. What did you discuss with Jacob?

Page 9

A. Just housekeeping rules. Basically what you explained. You know, don't talk over each other, typically about how long these things take. I was nervous. You know, just -- kind of just housekeeping and what time it starts. And I wasn't sure if it was an actual face-to-face Zoom or if it was just audio. You know, I've never done this before so I was just kind of -- you know, kind of getting prepared.
Q. Fair enough. Did you look at any documents while you were talking to Jacob yesterday?
A. I did not.
Q. Did you discuss any damage to the property?
A. We didn't discuss damage. We just discussed timeline of me actually being the property manager of the property.
Q. Did you discuss any repairs to the property or work done at the property?
A. No.
Q. Did you discuss any inspections that were performed at the property?
A. We did not discuss any inspections that were performed at the property, no.
Q. Did you discuss any roofers or individuals who might have performed work at the property at any time?
A. We just discussed that the roofer that had

Page 10

done work at the property I guess had his deposition a couple of weeks ago, or maybe last week.
Q. Right. And that would be Mike Hiser?
A. Correct.
Q. What did you discuss regarding his deposition?
A. We didn't discuss his actual deposition. It was just mentioned that he had his deposition. And then it was just -- and then I mentioned that he would be the roofer that I would call in the event that there was calls to the property or calls from the property in regards to roof repairs, that he was our preferred roofer that would be, you know, the roofer that went out to the property.
Q. Did you discuss anyone else who's given a deposition already in this case?
A. No.
Q. Have you reviewed any deposition transcripts?
A. No, I have not.
Q. Have you -- did you review any documents or materials, photographs, anything before the deposition?
A. No. The only thing that I've seen is the information that I provided to you guys, which was months ago.
Q. Okay. Who is your current employer?

Page 11

A. My current employer is Valcor Commercial Real Estate.
Q. How long have you worked for Valcor?
A. I just completed seven years in June. I've been here since 2016, June of 2016.
Q. What is your position?
A. I am a property manager at this time.
Q. Has that always been your position with Valcor?
A. No. I started as an assistant property manager.
Q. Okay. How long have you been the manager or the assistant manager for the property located at 903 East Bitters Road?
A. So when I started with Valcor in 2016, I was the assistant on that property until about, let's see, 16, 17, 18, probably for about two years, maybe two and a half years. And then my portfolio changed and another property manager came in, and another assistant was hired and they took over that property. And so then I was assisting on other properties. And then when I -- when the manager changed again, that particular assistant was still on that property.
And then when that assistant left -- I know it sounds confusing, but when that assistant left, I

Page 12

started assisting that manager, which was Dena Welch, and we had it for about a -- I was assisting Dena on the property for probably about a year and -- a little over a year and a half. And then I became the manager of the property when Dena left. I took over her portfolio.
Q. Are you still the property manager at 903 East Bitters?
A. I am not.
Q. When did you stop?
A. I stopped being the property manager as of July 31st of 2023.
Q. All right. So June 2016 to June 2018 you were the assistant property manager at 903 East Bitters?
A. Approximately, yes.
Q. And maybe it was give or take, it was sometime mid-2018 through the end of 2018 when you stopped becoming the assistant property manager of East Bitters for the first time.
A. Correct. I think it was more early 2019.
Q. Okay.
A. I think Marie Wilson was hired in the beginning of 2019. So it was like right at the beginning of 2019.
Q. Marie Wilson was hired at the beginning of

Page 13

2019, and Marie Wilson took over for you as the assistant property manager?
A. No. She was the actual -- see took over property manager of the property. And then I was assisting her for a very short time. And then we hired another assistant, which then took over Marie's portfolio, which is what I had. And so then that assistant manager was the one that was assisting Marie on her portfolio, which was what -- which was Redondo.
Q. Okay.
A. And I can get accurate dates for you. I'm just -- you know, like you said, it's been so long ago. I'm just trying to like -- I'm trying to work around COVID because a lot of the -- you know, a lot of the dates kind of -- just kind of coincide. Like this happened before COVID, this happened after COVID.
Q. Sure, understood.
A. So -- yeah.
Q. I think, you know, that the approximate dates should be okay. You finished in early 2019 with your first stint with 903 East Bitters?
A. Correct.
Q. And then you said that you had another time that you were the assistant property manager and then for a time the full property manager of 903 East

Page 14

Bitters, correct?
A. That's correct.
Q. What are the dates of your second time working with East Bitters?
A. It's going to be probably February, March of 2020 up until July of 2021 is when I was assisting, and then I became full property manager of the entire portfolio because Dena left in August of 2021.
Q. Okay. And then in August of 2021 through July 31st, 2023, you were the property manager for 903 East Bitters?
A. That's correct.
Q. You mentioned a couple other names. I heard Dena, and I think that is Dena Welch, correct?
A. That's correct.
Q. And then Marie Wilson also?
A. Yes.
Q. And then you also mentioned one other person who came in as the assistant property manager. Who is that person?
A. That was -- so there was two. There was Ruth -- oh, I can't remember her last name, Figueroa I think was her last name. She was here for a very short time. And then she was assisting Marie for a short time, and then that's when I took over.

Page 15

Q. Okay. Another name that I saw in some of the Valcor documents was Denise Smith. Who is --
A. Yes.
Q. -- that?
A. She is a current assistant property manager at this time. When I was managing Redondo, she was my assistant.
Q. When did Denise Smith start at 903 East Bitters?
A. Denise started in December of -- I believe she -- I think this December will be two years that she started with Valcor.
Q. Okay. So about December 2021 approximately is when she would have started, correct?
A. Yeah. Because I lost my son in February of 2021 during a snowstorm. That was December, I think -- yeah. December of 2021 is when she started. I'm almost positive. Again, I can get accurate dates, but I'm pretty sure that's when she started.
Q. Okay. Dena Welch, what was her timeline with the 903 East Bitters property?
A. So Dena was hired January of 2020 approximately, I don't know the exact date. And then she left Valcor July of 2021.
Q. And what are -- and she was an assistant

Page 16

property manager the entire time?
A. Dena Welch was the actual property manager.
Q. Actual property manager, okay. And Marie Wilson, what was her timeline at the 903 East Bitters property?
A. Okay. So we were in the old office when she started. Marie probably started in the summer maybe of 2018 or beginning of 2018. Yeah, it was the beginning of 2018 because I remember I was off the day she started. I can remember that only because it was Super Bowl Sunday -- Super Bowl Monday when I was off. And I think she was here through the end of 2019. And then Dena started shortly after that. I -- those dates are kind of foggy. I mean, I don't -- I know that Dena started right at the beginning of Jan -- or January of 2020. So then Marie did leave at the end of 2019.
Q. All right. So --
A. Yeah.
Q. -- Dena essentially took over for Marie Wilson?
A. Correct.
Q. All right. When you started in June 2016, between June 2016 and 2018 when Marie Wilson became the property manager, who was the property manager?

Page 17

A. For Redondo? It was Priscilla Aguilar.
Q. When did Priscilla Aguilar start?
A. With Valcor?
Q. Yes.
A. Priscilla was here when I got here. I don't know her exact date of employment -- like her exact start date. So I'm not 100 percent sure.
Q. Okay. And Ruth Figueroa, you said that Ruth Figueroa was at 903 East Bitters for a short period of time. What was that timeline?
A. I don't recall the actual dates. I would have to get that from Cyndi, our office manager. I do know, however, she was assisting Marie. That was Marie's assistant. I just -- there was so much kind of going on during that time period, I don't know her actual dates.
Q. Understood. We have discussed your time at the property, Priscilla Aguilar's time, Dena Welch, Marie Wilson, Ruth Figueroa, Denise Smith. Are there any other Valcor property managers or assistant managers who have worked at 903 East Bitters since you started in June 2016?
A. That we have currently on staff here or that are not here anymore?
Q. Even if they're not there anymore.

Page 18

A. The only other person that I might mention is Andrea Bross. She's a current assistant property manager here. However, she also assisted -- I believe she assisted Dena and Marie at one point because she was the first assistant property manager after me. But honestly, I can't recall if she ever even worked on Redondo. I can't recall.
Q. How do you spell her last name?
A. Bross, B-R-O-S-S. I'm trying to think if she ever even assisted. All of our portfolios were kind of being shuffled around. And she was more assisting Mary Lou at the time, so I can't recall if she ever even worked on Redondo.
Q. All right. So I take it you do not work on site at any properties you manage, correct?
A. That's correct.
Q. Where is Valcor's office?
A. So we are located at 1723 North Loop 1604 East. We're right at the corner of 1604 and 281.
Q. How often would you say you visited the 903 East Bitters property during your time as the assistant property manager and property manager?
A. As the assistant, whenever a tenant moved out I would do a walk through. Whenever, you know, I needed to meet a vendor on site and the property

Page 19

manager wasn't available, you know, I would -- that was part of my duties as an assistant was to assist the property manager on things like that. So as the assistant, it wasn't often that I would be on site. So, I mean, maybe once or twice a month as an assistant.
Q. What about as the property manager?
A. So as the property manager, you know, every property manager is different. But the way that I like to manage is, you know, I like to put my eyes on it pretty frequently. So I would try to get there at least once a week. You know, our -- the -- our office where I office out of is not very far. It's probably two and a half miles down the road maybe, three miles down the road. And so I pass it on my way into work. I kind of live in the area, so every chance I get, you know, I would just drive by to just make sure there wasn't trash or anything, you know. Just as a property manager that was just kind of the things that I would do.
So I would -- I mean, there wasn't really a month where I would say oh, I was here six times this month and two times this month. It would just be whenever I would have an opportunity to drive by. But personally I would try to get by at least once a week.

Page 20

Q. Did you manage -- I'm sorry?
A. I didn't say anything.
Q. Oh. Did you manage any other properties at the same time that you were the assistant property manager or property manager at 903 East Bitters?
A. Yes. When I was the assistant property manager, when I was assisting, we had a large portfolio. So I wasn't only assisting Redondo. And then when I became the property manager, same scenario, I wasn't only managing Redondo. I had a rather large portfolio.
Q. How many other properties did you manage at the same time as Redondo at 903 East Bitters?
A. So when I was the property manager I had approximately 25 properties in total.
Q. What about as an assistant property manager?
A. Probably about the same give or take a couple.
Q. And would it be fair to say that at any given time when you were the assistant property manager or when you were the property manager at Redondo at 903 East Bitters, that you had about 25 properties in your portfolio?
A. Yes, that's fair to say.
Q. Are all those other properties in San Antonio?
A. No.

Page 21

Q. How many of those are in San Antonio?
A. I'd have to go down the list. I don't have the list in front of me, but I would say maybe 90 percent of them are in San Antonio.
Q. Were any of them close to the Redondo 903 East Bitters property?
A. Now? Well, let me rephrase that, because if you're asking me if the current properties that we have or are you asking me the properties that I had when I was managing?
Q. Yeah, let me rephrase and ask you a more specific question. That's a good point. At the time -- so you started in 2016 -- let's go -- if the storm was in 2020, maybe around, you know, a little after the middle when you were working at the property. So May 2020, were you managing any other properties close to the property?
A. I was managing one, two -- I'm just trying to go down the list of all the ones that I had.
Q. Sure. Take your time.
A. Yeah. I had one, two -- I didn't have Hill Country yet. There's two in the area. I wouldn't say that they're close. I mean, I don't know what your definition of close is, close proximity, but there are two in our general area.

Page 22

Q. Fair enough. When you say the general area, about how far are they from the property?
A. Probably, I don't know, five, six miles maybe.
Q. Other than the insurance claim that's the subject of this suit, do you have any experience working with insurance claims or adjusting insurance claims?
A. Yes.
Q. What experience?
A. We had a car run into a building, and so I had to kind of go through that process of working through the driver's insurance company, you know, gathering proposals, working with the adjuster, scheduling repairs, getting pictures of come -- you know, the completed job, getting the insurance check, and things like that. But nothing as in depth as going through a deposition like this.
Q. Have you ever been involved in a claim for storm damage to one of the buildings that you've managed?
A. I have not.
Q. Have you ever been -- are you aware of any claims for storm damage that have ever been made to any of the properties that you manage?
A. Yes.

Page 23

Q. Other than this property at issue in this case?
A. Yes.
Q. How many?
A. I mean, with my time -- just my tenure here with Valcor, probably a handful, maybe five that I've, you know, had to assist, you know, gathering things for the property manager that I can remember.
Q. Are there any other storm claims for the Redondo 903 East Bitters property?
A. Other than this one?
Q. Yes.
A. No, not that I can recall.
Q. Have you ever worked with lawyers representing the property owners or insurance company in any of those other storm claims that you're aware of?
A. No, not that I'm aware of.
Q. Do you have any experience in roofing or construction?
A. I do not.
Q. Okay. As the assistant property manager for 903 East Bitters -- and just to clarify, when you say -- we've said Redondo a couple times. Is Redondo the name for the property located at 903 East Bitters?
A. Yes. That's the shopping center name, Redondo

Page 24

Shopping Center -- Redondo Place Shopping Center.
Q. Okay. And that's -- it's the property that's owned by the plaintiff that's the subject of this lawsuit?
A. That's correct.
Q. All right. So what are your job responsibilities as the assistant property manager?
A. As the assistant property manager we just -- we collect the rent; we keep in contact with the tenants; we call vendors when they have service requests; you know, we maintain the vendors when they're doing monthly service, landscaping, portering, things of that nature; assist with moving people out, moving people in; assist the property manager as needed when she's not available to go to the property; and then just assist the property manager on like reports and things like that, monthly reports.
Q. What are the monthly reports?
A. Oh gosh. Keeping the property manager delinquency management reports. The property manager typically -- or let me rephrase that. The property manager did the man -- the monthly management report. However, if there was things that she needed when doing like a -- what do you call it -- re-classes or anything like that or the budget comparison, if she

sees that she budgeted something for one month and it hadn't been paid, she'll be like: Hey, did this get done? And so I would look into that to see if, you know, a tree trimming had been done and we just didn't get billed for it or something. So anything like that to assist her in helping her with those reports, things of that nature.

Q. Do those monthly reports ever discuss maintenance or building repairs done to the properties?

A. If it was done during that particular month, yes.

Q. And it's standard to include a description of the work performed at the property each month in those reports?

A. If it was something significant. If it was just, you know, something small, I mean, we typically don't include that. If it was a pretty large costly repair, then we do. I mean, the -- we always let the landlord know prior to that, but then we also note it in the report.

Q. What is the threshold for the cost of a repair when you would reach out to the landlord and let them know about the repair?

A. So for Redondo, I believe it was 2,000. I



believe it still is 2,000. I'd have to refresh my memory and look at the management report -- or management agreement, but I believe it's 2,000.

Q. And that means any time a repair was being done at the property that would cost more than $2,000, you would actually notify Mr. Baheri about the repair?

A. Correct.

Q. And you would need his permission to go forward with it?

A. That's correct.

Q. What would you -- how would you notify him of those repairs?

A. If it was an emergency situation and we needed something approved right away, we would just call him and then seek his approval. If it was something that, you know, we knew that could wait, then we would email him proposals and wait for his approval.

Q. You also mentioned as part of the responsibilities for the assistant property manager being involved in vendors servicing the property and the monthly service to the property that might occur. When you say vendors servicing the property, would that include contractors making repairs that needed to happen?

A. So I couldn't understand your question because



it was cut off. So...

Q. Let me re-ask it.

THE REPORTER: It sounds like we're -- the witness is breaking up.

MR. SMITH: I heard that a little as well. Ms. Garcia, can you hear us?

THE REPORTER: Ms. Garcia, can you hear us?

THE WITNESS: Yes, I can. (Indiscernible phrase.)

MR. LANGLEY: Yeah, it's breaking up a lot on my end.

THE REPORTER: I was about to ask is that just me or is that --

MR. SMITH: Mine too.

THE REPORTER: Okay.

MR. SMITH: Yes, it's breaking up for me as well.

THE VIDEOGRAPHER: Do we want to go off the record?

MR. SMITH: Sure. Let's try to get it sorted out.

THE VIDEOGRAPHER: Okay. We're now off the record. The time is 10:39 a.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record.



The time is 11:00 a.m.

BY MR. SMITH:

Q. Before we took a break we were talking about your job responsibilities as the assistant property manager and you mentioned that one of those responsibilities was interacting with the service vendors and seeing that the monthly service was taken care of. Now, the vendors, does that include repairs performed on the property by contractors?

A. Yes.

Q. Okay. And when there is a repair performed, what is the -- I guess the process with -- involving -- I'm sorry, let me rephrase. What is your involvement specifically in repairs performed at the property?

A. Repairs called in by a tenant or just a repair that maybe I saw?

Q. Either one. Why don't you start with the tenant calling in.

THE VIDEOGRAPHER: Sorry, one moment. We lost plaintiff's counsel again. Sorry for cutting you off.

THE WITNESS: That's okay.

THE VIDEOGRAPHER: Let's give him a moment to reconnect and if he doesn't, I'll take us off the record.

Page 29

MR. SMITH: Okay.
THE VIDEOGRAPHER: We are now off the record. The time is 11:01 a.m.
(A recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 11:03 a.m.
BY MR. SMITH:
Q. Will you please explain your involvement with repairs for issues that are reported by tenants?
A. Yes. So if a tenant calls in any issues related to their suite, first I do look at the lease to see if it's a tenant responsibility or if it's a landlord responsibility. Typically anything on the inside of their suite is a tenant responsibility. Or if a tenant is reporting that they see a sprinkler head, you know, leaking or if they see a tree limb down, something of that nature, then it's property specific, you know, they'll either send me a picture or I'll know more or less on the area of the property where it's at. And so I'll know which vendor to call.
If it's a portering issue, we call our porterer. If it's a landscape issue, we call our landscaper. And so we'll call the vendor, the vendor will go out, look at the issue, and if it's something small, we just have the vendor take care of it. You

Page 30

know, if it's a bigger issue and it's going to be costly, then we'll have the vendor provide us with the proposal. If it's under that threshold, we'll get -- we'll seek approval. When I was assisting, I would give it to the property manager for approval. And then if I was managing then I would just -- if it was under the threshold I would approve it and get it taken care of.
Q. How did the tenants contact you to report damage issues with the building?
A. Typically by email. We do have the portal, the tenant portal. They can send in service requests that way. Some tenants are just used to emailing, so they don't always use the portal. Sometimes they'll just call. It would just really be up to the tenant on how they send it to us.
Q. What is the tenant portal?
A. So the tenant portal is a -- it's called AppFolio, and it's a site where tenants can actually go on and pay their rent. In that same portal, they can send in service requests, they can look up their ledger, they can see what their monthly charges are, they could update, you know, emergency contact information. It's just a portal for them to go in and look at their account basically.

Page 31

Q. If they submit service requests, is that through a chat feature in the portal?
A. So there's two ways that they could send in a service request. The first one is there's a maintenance icon -- a maintenance request icon that they can click on and it kind of takes them through is it an emergency, is it this, you know, is it plumbing, or whatever have you. But they can go on and do that. Or there is a chat option -- or no, let me rephrase that. Not a chat option.
It's a text option. It doesn't text my cell phone, it actually texts through the portal. And so whenever we get -- whenever a tenant sends in a text through the portal, it'll come to us as an email and then we go into the portal into their account and we can see that they've sent us a message.
Q. Okay. You also mentioned monthly services. What kinds of monthly services occur at the properties you manage?
A. We do landscaping -- so landscaping, porter -- well, in the landscaping, the irrigation checks, window cleanings, now hopefully that's just -- Dumpster pick-up. The most common is going to be your landscaping, your Dumpster pick-up, and your porter. I know I'm probably forgetting one, but it escapes me

Page 32

right now. Those are going to be your most common, you know, regularly scheduled maintenance to the property.
Q. Is there any regularly scheduled HVAC maintenance at any of the properties you manage?
A. The tenants are responsible for their HVAC maintenance.
Q. Does that include the rooftop units?
A. Yes.
Q. So the tenants schedule their own service for their own rooftop units and you provide access to the roof?
A. Yes.
Q. Is that true of Redondo at 903 Bitters as well?
A. For those leases at Redondo that I can recall, the tenants at Redondo are responsible for their HVAC units, yes.
Q. What about the roof itself? Who's responsible for the roof?
A. The landlord.
Q. Is there any kind of regular roof maintenance performed at any of the properties you manage?
A. Yes. We do regularly scheduled roof maintenance.

Page 33

Q. Does that include Redondo 903 East Bitters?
A. I can't speak for prior to me coming on board or prior to me managing the property. While I managed it, I can't recall if I had any inspections or anything that would prompt me to having inspections or maintenance done. Typically I would do that if there were any issues, and I can't recall if I had any need for that. Again, it's property -- or property-manager specific and depending on their property, but I can't recall an instance where like I have to have this maintenance done on the property because, you know, there were any issues on the time that I had it when I was assisting, other than after the fact of the storm.
Q. Okay. So are you saying that you don't remember there being any kind of regularly scheduled roof maintenance for Redondo Place but you would just need to address issues with the roof as they were reported by tenants?
A. (No audible response.)
Q. At any of the other properties that you manage, do you have regularly scheduled roof maintenance?
A. Well, I don't manage any properties at the moment. I co-manage with Priscilla, so I don't have them on my own. But when I was managing on my own --

Page 34

I'm trying to just go down the list of the properties in my head. Because a couple of them had new roofs, so I didn't really -- other than just a general maintenance inspection and the cleaning of a -- you know, like the rooftops and gutter cleaning, the properties that I had in my portfolio are pretty well off.
Q. Okay. So you didn't have any kind of regular roof maintenance at any other properties either?
A. No, not that I can recall.
Q. We talked a little bit earlier about the subpoena response that Valcor submitted in response to the subpoena submitted by my office. Do you remember that?
A. For me?
Q. Yes. The documents submitted by Valcor in response to the subpoena received from my office?
A. Oh, yes, yes.
Q. And you were actually involved in gathering responsive documents and producing those?
A. Yes.
Q. Did anyone help you gather the documents and produce them?
A. Denise helped me gather communication -- Denise helped me gather any tenant communication that

Page 35

was sent to her. The way that I operate is I like to be copied on some of the -- on the emails back and forth. A lot of times the tenant, you know, was just so used to emailing to me, so they didn't copy me. So I didn't have her send me anything that maybe the tenant sent her that I didn't have. And anything that we -- that I had that she had, it was duplicates and, you know, as long as I knew that we had them, then that's what I sent.
Q. Okay. Are emails, I guess -- is there any kind of like IT department or clerk who keeps the records of Valcor?
A. I believe so, yes.
Q. There's not?
A. I believe so, yes.
Q. Oh. Who are those people?
A. It's called Juern Technologies. I think that's them. J-U-E-R-N Technologies.
Q. J-U-E-R-N?
A. Yes.
Q. What do they do for Valcor?
A. They're our IT department.
Q. What about like a clerk or a records custodian that works at the Valcor office?
A. No.

Page 36

Q. I think earlier you mentioned someone named Cyndi who might have kept some kind of records who worked for Valcor?
A. Cyndi's our office manager, our executive --
Q. Office manager, okay. How long has Cyndi been the office manager?
A. Ever since I started back in 2016.
Q. What is Cyndi's last name?
A. LaFleur, L-A-F-L-U-E-R. I believe that's how you spell it.
Q. So when that subpoena came in, did the document subpoena actually go straight to you or did someone give you that document subpoena?
A. I don't recall. I don't recall. I do recall it was just placed on my desk. I don't recall who opened it or -- between the assistants, they all open mail, so I don't recall who opened it. I don't even remember if it was even opened. Maybe it was set -- just placed on my desk because my name was on it. I don't recall. That was three months ago.
Q. Does Valcor have a legal department or a lawyer that works there?
A. Not in our office, no.
Q. Is there anyone that works remotely, anybody that actually works for Valcor that's a lawyer that's

responsible for handling legal matters for Valcor?
A. I would probably refer you guys to Cyndi. I'm not -- I mean, I know that, you know, they contact legal. I don't think that it's anybody that's hired by Valcor. I think it's just an outside agency.
Q. Okay.
A. I mean under -- I don't think it's anybody employed. They don't -- they're not an employee of Valcor.
Q. But for the purposes of this subpoena response, it was just you received this subpoena somehow, you're not really sure, you don't really remember. But you were solely responsible for gathering responsive documents and producing responsive documents, correct?
A. Yes.
Q. And with the exception of the help you got from Denise Smith, who provided some tenant communications, no one else submitted any documents or helped you collect documents?
A. Correct.
Q. All right. How did you go about collecting responsive documents?
A. I went back through my emails. I went back through every single tenant of the property's portal



to see if they text or emailed through the portal. I looked up the ledgers, our operating statement. I think there was a year -- like a time frame that I was asked to give -- you know, submit these documents. I'm going to just say like 2020 to like 2023. So I had to print out our cash flow and operating statement so I can see each month if there was work done.
So that's kind of how I base my -- what I was looking for. And that's where I printed out all of the invoices and I think I may have sent in check copies. I don't remember if I sent check copies or not, but I know I sent the invoices. It was a long process to get all that information together.
Q. Okay. So you went through your emails, you went through your portal to get any kind of tenant communications, and then you said you went through ledgers for a defined time period, 2020 to 2023 approximately to see when work was done on the property so that you could pull the invoices and submit those?
A. It was whatever time frame was given to me. I don't remember if it was 2020 to 2023. It might have been even prior to that, but whatever time frame was given to me, that's the time frame that I used.
Q. Who provided the time frame to you?



A. I believe it was Brad's attorney.
Q. So they assisted you with responding to this subpoena?
A. They didn't assist with me responding. They just told me what time frame I needed to -- I believe it was Brad's attorney. I'd have to look back at my notes.
Q. Okay. Where do you have those notes?
A. I saved them on file. I save everything.
Q. Okay. So those would be -- I guess they would be in your files at the office?
A. Yeah.
Q. All right.
A. I scan them in.
Q. Okay. If we take a break --
MR. SMITH: Sorry?
MR. LANGLEY: Yeah, Richard, I don't recall ever having that conversation. I don't think that came from our office.
MR. SMITH: Okay.
BY MR. SMITH:
Q. Well, maybe if we take a break, could you pull those notes up and figure out what the time frame is that you looked for records to produce?
A. Yes.



Q. Okay. Let's take a five-minute break and try to find those notes for us if you can.
A. Okay.
THE VIDEOGRAPHER: We are now off the record. The time is 11:21 a.m.
(A recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 11:28 a.m.
BY MR. SMITH:
Q. Before we took a break, I asked you to try and locate the notes you took that specified a time limit for the documents you were gathering in response to the subpoena. Did you find the notes you were referring to?
A. Yes.
Q. All right. Please describe to me what those notes say.
A. So I saved them in the file as notes from Alex at ZMFF&J.
Q. Okay.
A. And the notes I took were just on paper because it was a phone call that we had, and so he was telling me what he meant.
Q. Okay.
A. And so I was told that he needed -- so I'm

Page 41

just going to kind of go down, because now once I see them I'm remembering our conversation. So I was told that the date of loss which -- the date of loss was May 27th, 2020. And so he needed -- anything from -- I wrote December 20 -- if I can read my memory, I wrote December 2021 and then I wrote now. So I think I wrote December 2021 to now. And then I was just writing -- as he was telling me what he needed, I was just writing. So there's just a bunch of just notes on here.

Q. Okay.

A. So I don't know if I need to read all of these?

Q. Yeah --

MR. LANGLEY: Richard?

MR. SMITH: Yes?

MR. LANGLEY: Do you mind if I interject?

BY MR. SMITH:

Q. I was going to say that I would like to get a copy of those notes if you can provide those to me, please. If that'd be possible.

A. Are you talking to me?

Q. Yes, please.

A. Am I allowed to do that?

Q. Yeah. You -- they're not your lawyers. So,

Page 42

you know, this is a -- it's not privileged or anything like that.

A. I --

MR. LANGLEY: Richard, Alex is one of my assistants.

MR. SMITH: Right.

MR. LANGLEY: That may be a phone call in conjunction with responding to discovery requests and not the subpoena itself.

MR. SMITH: Okay.

MR. LANGLEY: I don't think that was in relation to the subpoena. I think that was whenever we were trying to answer interrogatories and gather documents to answer discovery requests, because there's a lot of information that Brad did not know, so he would have pointed us in the direction of Valcor who handles more of the day-to-day operations.

THE WITNESS: I would agree to that just based off of what I wrote.

BY MR. SMITH:

Q. Okay. Do you -- is that saved in a -- is it a separate document, those notes?

A. Yeah. I saved those notes in the same file that I saved everything that I sent to all -- like all the invoices and pictures, emails that you guys

Page 43

needed.

Q. That you provided?

A. Yes. That I provided, yes.

Q. Okay. So what date are those notes?

A. What date was the note that I took?

Q. Yes.

A. Well, I saved it May 2nd, so I don't have a date on when I actually took the note because I just -- it was just literally written on a piece of like -- a piece of paper.

Q. Okay.

A. And we had a scheduled call. And so, you know, just writing things. But I saved it May 2nd of 2023.

Q. Okay. Could you provide -- I guess those notes would be you said in the same folder that contain all of the documents that you provided. Are those documents that you provided to Alex based on that phone call?

A. I don't think I sent him the notes that I took. I sent him what he asked for. Those notes I just saved because I save -- I tend to just -- I knew how important this was, so I wanted to just save those notes because I didn't know where this was going to go, so --

Page 44

Q. Understood.

A. -- I just saved them in my files in the same area that I sent everything else that you guys -- whoever needed all these invoices.

Q. Okay. And I guess the other documents in the file besides the notes would be the documents that you actually collected and sent to Alex based on that phone call you had?

A. (No audible response.)

Q. Okay. Could you send the notes and then whatever documents that you provided?

A. Yes. It's -- they provided me a link because the files are so large.

Q. Okay. We can do the same thing.

A. Okay.

Q. Let's --

MR. LANGLEY: Richard, we may -- that link may still be active. I could probably just forward it to you.

MR. SMITH: Okay. Would it still show up with other things that may have been added since then?

MR. LANGLEY: If things were uploaded to the same link, I believe so.

MR. SMITH: Okay. You know, it might be easier to just get them directly from Ms. Garcia just

Page 45

so that we know or I can be sure it's, you know, coming from the source and --
MR. LANGLEY: Yeah, that's why -- I just wanted to be transparent --
MR. SMITH: Sure. I appreciate that.
MR. LANGLEY: -- that I can provide that as well if you need it. But sure.
MR. SMITH: Okay. Well, I'm sorry to do this again. Let me take another five minutes. I'm going to get a link that I can send to you, Ms. Garcia, so that you can upload those files.
THE WITNESS: Okay.
MR. SMITH: Okay. Let's --
THE VIDEOGRAPHER: We are now off the record. The time is 11:35 a.m.
(A recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 11:57 a.m.
BY MR. SMITH:
Q. Okay. Ms. Garcia, thank you for uploading these documents.
A. You're welcome.
Q. I'm going to share my screen and mark as Exhibit Number 1 to the deposition this document.
(Exhibit 1 was marked for identification.)

Page 46

BY MR. SMITH:
Q. Can you see the document on my screen?
A. Yes.
Q. Okay. And I will -- I'll scroll down to the bottom. It looks like there's two pages scanned in of handwritten notes, like a front and a back. There's no notes on the back, just the front. Do you recognize these notes?
A. Yes.
Q. Are these the notes that we were just discussing that you took during your call with Alex from ZMFFJ?
A. Yes.
Q. And you said that you uploaded these notes around I think May 2nd, 2023; is that correct?
A. I saved them to my file on that date just along with all the other information that I saved.
Q. Okay, understood.
A. I didn't --
Q. And you presumably took the notes during the call with Alex at ZMFFJ at some point before then, but that was just the date that you actually scanned in the notes and saved them to your file?
A. (No audible response.)
Q. What -- well, looking at the notes here it

Page 47

says December 2021 to now?
A. Yes.
Q. What was that note in reference to?
A. I -- our call was -- if I uploaded it in May, I think our call was maybe given in April. I don't recall the exact date, but...
Q. So before we took the break, you mentioned that Alex had told you about some kind of timeline that you were to gather and produce documents from; is that right?
A. Yes.
Q. Okay. So is that timeline reflected in these notes?
A. Yeah. I may -- yeah, it -- well yes, it is. I may have meant to write December 2020. I was writing so fast and I was just trying to make sure I wrote everything down correctly.
Q. Okay, understood. Looking at the documents that you produced, there are I think one, two, three, four, five, six, seven PDF files; is that correct?
A. That I sent to them?
Q. That you sent to them, correct.
A. Correct.
Q. All right. And it looks like they are marked 2020 Invoices and Pic, 2021 Invoices and Pics, 2022

Page 48

Invoices and Pics, 2023 Invoices and Pics. That's four of the documents; is that right?
A. Yes.
Q. And those documents are -- here, I'll stop sharing my screen -- are invoices that you actually submitted for those corresponding years, correct? For instance, if it's titled 2020 Invoices and Pics, then all of the invoices and pictures in that file are from the year 2020?
A. Correct.
Q. Okay. I'll mark this as Exhibit Number 2 to the deposition.
(Exhibit 2 was marked for identification.)
BY MR. SMITH:
Q. Can you see the document on the screen?
A. Yes. It's sideways, but I can see it.
Q. Yes, I know. I realize it's sideways. It looks like this first page says: General Ledger 2-1-2020 to 2-29-2020 is what it starts on. And I'll kind of quickly scroll through, but it's -- there are a number of pages of invoices here in this sheet that's marked -- this file is called 2020 Invoices and Pics.
A. Yes.
Q. I know it looks like it just kind of goes

Page 49

through month by month the general ledger for the year 2020 and then any corresponding invoices for work performed in that month; is that right?
A. (No audible response.)
Q. Okay. So is this document, this 2020 Invoices and Pics, this is one of the documents that you provided to the plaintiff based on their -- that call that you had with Alex at ZMFFJ; is that right?
A. (No audible response.)
MR. SMITH: I'm sorry, I'm having trouble hearing the witness. Is anyone else?
MR. LANGLEY: Yeah, I'm not hearing any response.
THE REPORTER: Yes. I don't hear anything either.
THE WITNESS: Can you hear me now?
MR. SMITH: Yes.
MR. LANGLEY: Yeah.
THE WITNESS: Yeah, that's correct.
BY MR. SMITH:
Q. Okay. So -- sorry, just to clarify, this file that I'm showing right now, Exhibit 2, titled 2020 Invoices and Pics, this is one of the documents that you provided to Plaintiff's counsel based on that phone conversation you had with Alex at ZMFFJ?

Page 50

A. Yes, that's correct.
Q. All right. And it looks like the first month here is February of 2020, correct?
A. Yes.
Q. All right. And in February 2020 it looks like there were two checks both cut to Done Right Services?
A. Yes.
Q. And the first is dated -- is an invoice for $324.75 dated January 21st, 2020, from Done Right Services, correct?
A. Yes.
Q. And then the second is another invoice January 24th, 2020, also Done Right Services for a roof repair, correct?
A. Yes.
Q. All right. Okay. Did you provide any invoices for work done to the roof prior to 2020?
A. No. According to what I sent, it looks like I only did starting in 2020.
Q. And what was based, I guess, on that conversation that you had with Alex at ZMFFJ? He asked you to produce the documents beginning in 2020?
A. Yes.
Q. All right. Okay. I'll mark this as Exhibit Number 3 to the deposition.

Page 51

(Exhibit 3 was marked for identification.)
BY MR. SMITH:
Q. Can you see the document on the screen?
A. Yes.
Q. All right. This is another email -- I mean, sorry, another file that you just uploaded to us, and it is titled: 2021 through 2023 Emails Mona. And I will scroll through it real quick so that you can see the whole document. But the first page is a 20 -- June 22nd, 2021, email between Dena Welch, Fred Foster, Mike Hiser, and Mona Garcia. Can you see that?
A. I can.
Q. All right. And then I'll quickly scroll through here. It looks like a collection of emails that you were involved in during the year 2021 through 2023; is that accurate?
A. Yes.
Q. All right. And is this file, is this one of the files that you produced to Plaintiff's counsel based on that phone conversation with Alex at ZMFFJ?
A. Yes, it is.
Q. Okay. And was your decision to limit the emails that you sent to the time period of 2021 through 2023, was that based on what Alex asked for

Page 52

during that phone conversation you had with him?
A. I don't understand the question. Say that one more time.
Q. Sure. Why did you decide to only send your emails between 2021 and 2023 and nothing earlier than that? Sorry, Ms. Garcia, if you're speaking, we're -- we can't hear you again.
A. No, I'm not speaking. I was looking --
Q. Okay.
A. -- at -- I was looking at what I sent just to make sure that I hadn't sent previous emails.
Q. Sure.
A. And if I can remember correctly, it's because I only sent what I was -- if I can remember correctly, I think I only sent what I was a part of at that time, or what I had access to.
Q. Okay. What do you mean by that?
A. So for instance like I don't have access to Dena's emails, so if she had any emails that I wasn't a part of, I won't have access to those. So I only sent emails that I was copied on or that I had knowledge of.
Q. Okay. Do you have any emails related to this property prior to 2021?
A. In regards to the roof leak or in regards to

Page 53

the roof?
Q. In regards to any damage at the property.
A. If I was on the property, I mean if I was assisting on the property I'm sure I do.
Q. Did you search for any emails related to damage to the property prior to 2021?
A. I can't recall if I did. There was so much in here that, you know, I sent, I'm sure I did. I mean, I'm -- I've got, you know, Dena's emails that I was copied on, so I'm sure I searched as much as I could to get as far back as I could.
Q. Okay. Do -- and, you know, I appreciate that. And I'm not trying to trick you or anything like that. I'm just trying to figure out, you know, whether or not you know one way or the other if you did actually search for emails before then or if you made a conscious decision for whatever reason to limit your search to 2021 to the present. Do you remember what the scope of your email search was?
A. Typically when I search, I'll search for things like roof leak, roof repairs. I'll search by vendor name, I'll search by tenant name, I'll search by -- you know, just use those kind of key words. I'll search by different folders that I have. I have a vendor folder, I have a folder for me. So I'll go

Page 54

through each folder.
I mean, I do a pretty significant search. I tend to save everything just 'cause I like to revert back to things that -- you know, because I do have so many properties that I don't remember everything, you know, off the top of my head. So if I have to remember something, it's easier for me to just type it in and then I can pull up the email. So I mean I'm almost positive that I searched as much as I could to get as much as I could.
Q. Okay. And you don't delete emails for whatever reason, you said you're pretty good about saving your emails?
A. Correct.
Q. All right. So do your emails that you saved, do some of those predate 2021?
A. Yes.
Q. All right. Okay. You also submitted documents directly to my firm in response to our subpoena to you. Do you remember that?
A. I do not.
Q. Okay. Let's do this.
(Exhibit 4 was marked for identification.)
BY MR. SMITH:
Q. Can you see the document on my screen?

Page 55

A. Yes.
Q. All right. I'll scroll down. It's two pages. It's an email chain and it looks like it's between you, Trey Winslett from my office, and me, Richard Smith. Do you see that?
A. Yes.
Q. And then Priscilla Aguilar is also copied who is I think the former property manager at the property, correct?
A. Yes.
Q. Is she still with Valcor?
A. Yes.
Q. Okay. So I'll scroll down to the bottom here, but does this email kind of refresh your recollection about the subpoena that I'm talking about?
A. Yes. My apologies. She's --
Q. No, no problem.
A. -- still here.
Q. That's why we've got the records. Sorry, go ahead.
A. I'm just reading.
Q. Sure.
A. Okay. So that was June. Okay, yes. Sorry.
Q. Okay, great. And it looks like you sent this email Wednesday, June 28th, 2023: In regards to the

Page 56

attached subpoena, I'm requesting the ShareFile link; is that right?
A. Yes.
Q. And then it looks like the ShareFile link was provided Wednesday, June 28th, 11:23. And then you responded at 1:49 the same day, June 28th, saying: Thank you, the files have been sent. Correct?
A. Yes.
Q. All right. Do you remember uploading files to that link in response to the subpoena?
A. (No audible response.)
Q. I'm sorry, we didn't hear the response there.
A. Yes, I did. Now that I see it, yes.
Q. Okay. And I'll mark this as Exhibit Number 5 to the deposition. And I will scroll down --
THE REPORTER: Counsel, I apologize. The did you mean to skip four?
MR. SMITH: Did I skip four?
THE REPORTER: Did you mean to skip four?
MR. SMITH: No, I did not mean to skip four. I thought I had marked the email as Exhibit 4. What did I mark the email as?
THE REPORTER: That's three. I have the notes as one, the invoices as two, the emails as three.
MR. SMITH: Okay. And then this email that I

Page 57

just showed was number 4.
THE REPORTER: Okay, thank you. I'll put that down.
MR. SMITH: Okay, thanks. Okay. So I'll mark this as Exhibit Number 5.
(Exhibit 5 was marked for identification.)
BY MR. SMITH:
Q. And I'll scroll. This is from Lexitas, notice of subpoena. It has an Exhibit A. And it has on Page 5 and 6 about ten requests for documents to produce. I'll keep scrolling. The subpoena itself. It says here: In lieu of physical production, please send files electronically to T Winslett at QSLWM. Send a request -- email requesting a ShareFile link. Keep scrolling. And then it repeats this notice with the document request. Do you recognize this subpoena?
A. Yes, I do.
Q. Okay. And this is the subpoena that you received from my office and uploaded those documents in response to?
A. Yes, it is.
Q. When you submitted documents in response to this subpoena, did you add any additional documents or produce anything in addition to the documents you had previously submitted to Plaintiff 's counsel?

Page 58

A. Can I have a moment to look at what I --
Q. Sure.
A. -- picked? Yes.
Q. What other documents were added for this subpoena response?
A. It looks like we added -- looks like I added roof proposals and invoices for 2019.
Q. Were there any documents that were taken out after the subpoena response?
A. No. I wouldn't have had any reason to delete the files.
Q. Okay. So you added in the 2019 invoices, correct?
A. Proposals and invoices, yes.
Q. Did you look for any invoices prior to 2019?
A. No.
Q. Why did you decide to stop at 2019?
A. I think it was because -- I want to say it was probably because Beka One wasn't the ownership prior to 2019.
Q. Okay. And is that just -- will you kind of walk me through your process for making that decision. Was it just because the lawsuit was filed by Beka One so you decided to stop prior to when Beka One took over the property?

Page 59

A. Can I -- I mean, I asked Priscilla and it's just something that we practice here. We don't share information from a previous ownership.
Q. Okay. Will you produce prior invoices for repairs to the property?
A. I would have to ask Priscilla.
Q. Okay. Well, if we -- you know, looking back at the subpoena that we marked I think as Exhibit Number 5, it's not limited to the time that the plaintiff was the owner of the property. So we did request repair records prior to the occurrence, and those would be responsive. So we would like those documents. And I guess, you know, there are ways to enforce subpoenas in court and obviously we don't want to -- there's no reason to get into any of that now. But I think we should plan to discuss production of those other repair records maybe after the deposition. Okay?
A. Okay.
Q. All right. Okay. So that's invoices. Regarding emails, I see that the emails that you produced in response to the subpoena, it's the same file for emails that you produced to Plaintiff's counsel limit to 2021 to 2023, correct?
A. Yes.

Page 60

Q. All right. And the decision to -- we've already discussed your decision to limit the -- or I guess -- I think you testified that you didn't intentionally limit the email search to 2021, that's just what happened when you ran your search. You didn't get any responsive emails prior to 2021?
A. (No audible response.)
Q. Did anyone else search their emails for documents that may be responsive to the subpoena?
A. For the subpoena? Not that I'm aware of. I don't know.
Q. Is there a reason that only you were asked to search your emails and produce your emails and, for example, Priscilla Aguilar was not asked to do so?
A. I don't know if she was asked or not.
Q. Okay. But none of her emails were produced, correct?
A. Going through these briefly, it doesn't look like it, no.
Q. And Dena Welch and Marie Wilson, they no longer work at Valcor, correct?
A. That's correct.
Q. Is there a way to search for their email history even though they no longer work for Valcor?
A. I'm sure there is. I don't know without

Page 61

asking IT.
Q. Have you -- did you ask the IT in connection with the subpoena?
A. Did I ask IT to show them the subpoena?
Q. Yes.
A. I did not.
Q. And you didn't ask IT to try to run a search for emails Dena Welch and Marie Wilson may have sent that could be responsive to the subpoena; is that right?
A. I don't recall asking IT. I may have asked Cyndi because Cyndi archives our emails. So I may have asked her to run a search, but I know I did not ask IT, no.
Q. Okay. And it's okay, you know. I just want to get to the bottom of exactly what you've done. But you don't specifically remember asking Cyndi to do that, do you?
A. Not for Marie Wilson, no.
Q. Do you specifically remember asking her to run a search for Dena Welch's emails?
A. I'd have to look back in my email to see if I sent her an email for that.
Q. Okay. But we don't have -- no emails from Dena Welch or Marie Wilson were produced. The only

Page 62

emails that were produced were from your emails, correct?
A. Well, I did produce emails that I was copied on from Dena Welch.
Q. Right. Did those come from your email files?
A. Yes.
Q. So none of the emails that were produced came from Dena Welch's email files or from Marie Wilson's email files?
A. Correct.
Q. Okay. All right. So I think we'll probably add that to the list of documents that we are going to request in response to the subpoena that we haven't been provided. So running a search for Dena Welch's emails that she may have relevant to the property from any time. The same with Marie Wilson prior to the May 2020 storm or after.
A. Okay.
Q. And then Priscilla Aguilar as well.
A. Okay.
Q. Okay.
A. You'll send me an requesting all that --
Q. I will send -- I will definite follow up via email after this deposition, so --
A. (Indiscernible phrase) -- okay.

Page 63

Q. Understood. I know it's tedious, but it helps to get these things out on the record now so that we have something we can refer back to and know exactly what we talked about and exactly what was discussed during the deposition. So I appreciate you bearing with me on all these questions about documents from a while ago. I know it's hard to remember these details.
A. Yeah, no. I understand.
Q. Okay. I think the last thing that I want to talk about in terms of the documents is I see two tenant portal text message files. There's one that you produced in response to our subpoena, and then there's another that you sent to Plaintiff's counsel after your call with Alex at ZMFFJ.
A. Okay.
Q. Do you have access to both of those documents right now?
A. So the one that I'm looking at currently is the one that I re-sent in response to the subpoena.
Q. Okay. Great. Can you also look at the version that you sent to Plaintiff's counsel after your call with Alex at ZMFFJ?
A. Yes, one moment. Sorry. Hold on. Okay, I found it.

Page 64

Q. Okay. All right. I'm going to mark this as Exhibit Number 6 to the deposition.
(Exhibit 6 was marked for identification.)
BY MR. SMITH:
Q. Can you see the document on the screen?
A. Yes.
Q. Okay. And I'll quickly scroll through, but it is a few pages of what looked like text messages from the tenant portal that you were talking about earlier; is that correct?
A. Yes. Yes, I'm --
Q. All right. And this file here, Exhibit Number 6, this is the version of the text messages that you provided in response to the subpoena from my office; is that correct?
A. Yes.
Q. All right. And then I will mark this as Exhibit Number 7 to the deposition.
(Exhibit 7 was marked for identification.)
BY MR. SMITH:
Q. This is another document with text message history, and it looks like text messages from the portal -- the online portal that we discussed earlier. And this, I believe, is the version of the text message history that you provided to Plaintiff's

Page 65

counsel after your call with Alex at ZMFFJ; is that correct?
A. Yes.
Q. Okay. And now looking at both of these documents, Exhibit 6, Exhibit 7, obviously the version that was provided to my office in response to the subpoena has been edited down and some of these text messages have been removed, correct? Or covered up when they were copied? You can take some time to review them if you need.
A. Yeah. It appears that way, but I'm not really sure why it looks like that because I didn't take anything out. I don't -- I didn't take any of these things out.
Q. Okay. So do you have any idea how the file got edited down or some text messages removed from the version that was sent to my office?
A. Well, I'm not going to agree that they were edited out or removed because I didn't do that.
Q. Fair enough. Do you have any idea why the version that was sent to my office has less text messages than the version that was provided to Plaintiff's counsel?
A. I don't know. It could have just been the way it was printed, maybe the filters when it was printed.

Page 66

Because it looks like it starts out at 2022 and goes through 2021. But then -- so it looks like when I -- and this is just based off of what I can remember, but it looks like when I printed out the initial set of text messages from the portal, I printed everything. I mean, even stuff from like electricians, talking about rent, late fees, needing roof access for the ladder. I mean, I printed everything. And then when I printed -- I don't -- I can't answer why it looks like that.
Q. Okay. And you know I -- you know, well, I'll rephrase. Did you make any conscious effort to remove irrelevant text messages from the version that you produced to my office?
A. I did not.
Q. Okay. So you're not sure how the versions are different?
A. No.
Q. Did -- is there anyone that you can think of that helped you with the production that might have removed irrelevant text messages from the version that came to my office?
A. The only one that helped me gather this information was Priscilla.
Q. Okay.

Page 67

A. I'm not saying that she did that, but I mean --
Q. Fair enough. But she helped you a little bit with the production?
A. Of the subpoena documents, yes.
Q. Understood.
MR. LANGLEY: And Richard, you received the full document from our office --
MR. SMITH: I did.
MR. LANGLEY: -- correct?
MR. SMITH: I did. I got it.
MR. LANGLEY: Okay. I just wanted to be sure.
MR. SMITH: Yes.
BY MR. SMITH:
Q. Okay. So what role did Priscilla have in gathering documents responsive to the subpoena?
A. If I can remember correctly, I believe I was out of the office. I'd have to look back at my emails. But there was a time I was out of the office because it was time sensitive and it needed to be done. And so she assisted in getting -- looking through and making sure everything was, you know, what we needed. I'm not --
Q. Okay.
A. I'd have to look back through my emails, but

Page 68

I'm pretty sure that's what happened. I think I was on vacation if I'm not mistaken.
Q. Understood. Okay. Looking at Number 6, Exhibit Number 6 on the -- you know, the first page here it looks like a conversation between Cosmic Mayhem and Denise Smith from Valcor about a maintenance issue at the property; is that correct?
A. Yes.
Q. All right. And this is -- this one specifically is at the top of the page, that first page it looks like it's an October 20th, 2022, issue. Then here on the -- and it says that there was a leak when it rained. So is this -- will you explain to me kind of how the portal works in terms of, you know, I'm looking here at this sheet. When you're actually using the portal, what's the process there?
A. So the tenant will -- there's two ways that they could do this. They could log into the portal and send us a text message or they can save the number that the portal texts from to their phone and, you know, just text us back from that. So I don't know how this tenant sent us this message, whether he logged in or he used his cell phone to send us the message. But when we get -- so for instance, the October 20th at 2:30, you know, that message came to

Page 69

us. We get an email that says that you have a message on the portal. That particular email will say what the message is, and then we can go into the portal to respond. And so that's how we communicate back and forth.

So he sent the message at 2:30 and then Denise responded at 3:11, and then the tenant responded at 4:57, and that's how -- and that's the timeline of the correspondence.

Q. So there will be -- I guess from the tenant's side, you know, assuming they're using their phone, they can either log into their computer and submit a request that's like a text or they can literally use their phone and send a text message to the reply number and it would go through to Valcor, correct?

A. Yes, that's correct.

Q. And then on Valcor's side, you actually receive an email when you get a request from the tenant through the portal?

A. That's correct.

Q. Who is set up to receive the emails when a tenant does text to the portal?

A. Whoever is on that portfolio. So for instance, at that time in October of 2022 -- let me back up. Whoever -- there's several different ways

Page 70

actually. So for instance if I sent this tenant an email asking him about his rent, when he replies to that it's going to come to me because I initiated -- right, I initiated the conversation. If the tenant initiates a conversation, it's going to -- the way I understand it, it's going to go to the last person that they had a conversation with.

So from what I understand, that's how this communication got to Denise is because he was communicating with Denise prior, probably about something else. And so that's how it gets to Denise. It doesn't -- it's not a company-wide thing where everybody gets the email from the tenant, or the email that there's a text message on the portal.

Q. I see that in Exhibit 7 the -- I guess the version that was sent to the plaintiff's counsel, the earlier -- earliest messages here are 2019. Was the -- did you use the same date cutoff that you used for invoices to limit your production of these text messages?

A. No. I think -- I'd have to go in and see what my filters were on one of those dates specifically. If I started at 2019, it more than likely was because those were the dates that I was given.

Q. Okay. And that would line up with I guess

Page 71

your decision with Priscilla that we discussed earlier to limit the production of invoices and provide that date cutoff from the time that the current plaintiff, Beka One, LLC, became the owner, right?

A. I don't think I asked her about the text messages in that reference.

Q. Fair enough. Is it possible to search the text messages prior to 2019?

A. I'd have to log in and look. I don't --

Q. Okay.

A. I'd have to log in and look.

Q. Okay. Back to Exhibit 6, on the second page of these text messages, it's another conversation that looks like it starts on November 16th, 2022. Do you see that?

A. Yes.

Q. All right. And the first message from Cosmic Mayhem says: Denise, we have another leak. This time it's in a different spot. It's pretty bad. Denise responds: I sent an email to our HVAC vendor. Are you going to be there the rest of the day? Who is the HVAC vendor for the Redondo property?

A. At that time, Cool Planet Air I think was servicing the property.

Q. Have there been other HVAC vendors for the

Page 72

Redondo Place property?

A. That would be something that I would have to look up. I know that when I was managing it, I would use Cool Planet Air. The tenants chose their own. If it -- I would have to look that up. I don't recall if there was anybody else that worked on the property.

Q. Okay. And here, you know, it says that Denise says that she'll send an email to our HVAC vendor. Does Valcor maintain an HVAC vendor or would this -- are these vendors the responsibility of the tenant?

A. So the HVACs are the responsibility of the tenant. I can't speak as to why she said she would call an HVAC vendor, which is I'm sure why he said that he doesn't think it's the H -- he doesn't think it was an HVAC-related issue. I'd have to scroll down and see what the outcome of that conversation was, but I'm not really sure why she said she would call an HVAC vendor because again, typically the HVAC is a tenant responsibility.

Q. Fair enough.

A. And you have to understand, sometimes when we're dealing with several properties, we do have tenants that, you know, the landlord does take care of their HVAC. So with so many properties, she may have just finished a phone call with somebody who the

Page 73

landlord does take care of their AC, so in her mind she was like: Okay, I'll call an HVAC vendor. I mean, that happens.
Q. Okay. Understood. All right. Going back to what we marked as Exhibit 2, the 2020 Invoices and Pics that you provided to Plaintiff's counsel after your call with Alex at ZMFFJ.
A. Yes.
Q. We looked at the January 2020 invoices for Done Right Services, and the second one, the January 24th, 2020, Done Right Services invoice for the roof repair for 2,200 and -- no, sorry. $2,435.63. Do you see that?
A. Yes.
Q. So this amount would have required you to reach out to Plaintiff and notify them of the cost of this repair?
A. Can you scroll up to the date again?
Q. Sure.
A. So yeah, that would have required Dena to reach out to Brad.
Q. So and --
A. And --
Q. Sorry, go ahead.
A. I was going to say if I am correct in saying

Page 74

that the threshold was 2,000.
Q. And how would you figure out that threshold?
A. It's in our management agreement.
Q. Okay. And when you say Dena would have reached out, she would have had to make contact with Brad Baheri to let him know the cost of the repair and get approval for it before it happened?
A. Yes.
Q. All right. Can you look up the threshold?
A. Yes. It looks like according to this particular agreement, the threshold for maintenance is a thousand dollars.
Q. Okay. Which means any repair that would be over a thousand dollars you would reach out to Brad Baheri and get his approval?
A. Yes.
Q. All right. Okay. Let's get into the repairs that have been performed at the property. We talked a little bit earlier about when the storm was that's the subject of this lawsuit, and you said that you remember the storm being on what day?
A. According to my notes, I wrote down May 27th, 2020.
Q. What notes are you referring to, the notes we just discussed?

Page 75

A. Yes. The notes that I took when I spoke with Alex.
Q. Got it. But there were roof leaks at the property prior to May 27th, 2020, correct?
A. There were some, yes.
Q. Tell me about the roof leaks before May 27th, 2020?
A. The ones that I can recall weren't significant. They were just minor roof leaks here and there.
Q. What do you mean by not significant roof leaks?
A. Nothing that was caused by hail damage. Nothing that --
Q. Right.
A. -- would --
Q. Do you know what was the cause of those prior roof leaks?
A. Not without looking at their invoices and the description. I'm not a certified roofer, so I don't really understand the lingo.
Q. What tenant spaces were experiencing roof leaks prior to the May 27th, 2020, storm?
A. That I can recall, Tapout -- or no, I'm sorry, not Tapout. Cosmic Mayhem is one of them, I think

Page 76

maybe Tapout had a small leak. Without refreshing my memory on the -- on all of the invoices and stuff, I mean, I can't really -- but I do know Cosmic just because we -- you know, we reviewed it and I do remember, you know, speaking to Eric about it.
Q. Right. Okay. And, you know, when you said they were not significant leaks prior to the date of that storm, is there anything other than the fact that they were not hail damage that makes you think that they were not significant?
A. No. I -- what I meant by that is prior to the hailstorm it was, you know: Hey, I have a roof leak here; hey, I have a roof leak there. And it seemed they had increased after the hailstorm. The cause for roof leaks -- the areas of the roof leaks, just the calls for service themselves of roof leaks seem to have increased after the hailstorm.
Q. And do you know how much they increased, by what factor, anything like that?
A. I'm sorry, I don't understand your question.
Q. Yeah. Before the storm, how often did you get calls about roof leaks from the tenants?
A. I don't know without doing an accounting. It wasn't something that I spent, you know, a lot of time on. And I don't know if you're from San Antonio or

Page 77

not but, you know, there's times when we didn't have periods of rain, then it rained. So, you know, there could be months where we didn't have any calls at all because we didn't have any rain. And then there's times where we got calls because -- you know, in that short amount of time because it did rain.

And so when I say that the calls increased after the hailstorm, it just appeared that they increased because, you know, there was such -- to me, I felt like there was a lot more calls after that because they have all these leaks. And that's just my feeling.

Q. Understood.

A. I can't put a number on it because I -- I mean, I -- it's in their account, but...

Q. Okay, fair enough. And I think, you know, we looked at Exhibit Number 2, and Exhibit Number 2 was the 2020 Invoices and Pics, and we looked at that January 2020 roof repair invoice from Done Right Services. Do you recall that?

A. Yes.

Q. All right. Done Right Services, is that a roof vendor that Valcor works with?

A. Yes.

Q. When you -- was Done Right Services the roof

Page 78

vendor for Redondo Place at the time that you started with Valcor?

A. No.

Q. Who was the roof vendor at that time?

A. I don't recall the actual roofer. The only reason why I know that Done Right was not the roofer was because the owner of Done Right worked for another roofing company and didn't start his business until a couple years after I started with Valcor. So -- but I don't know exactly who -- without looking, I can't tell you who the actual roofing company was. I mean, it could have been Empire. I don't recall who it was at that time.

Q. Are you saying that there was a roofer who worked for the vendor when you started at Valcor that then subsequently broke off and started his own company and you stuck with that roofer?

A. No, that's not what --

Q. Okay.

A. -- I said. So I'm saying that the owner of Done Right worked for a different roofing company. We hadn't used Done Right -- we didn't start using Done Right until he branched off into his own, right? To -- and I don't recall what year he did that. I mean, I don't know what year Jesse went off on his

Page 79

own. So to say that Done Right was the roofer when I started with Valcor in 2016, Done Right was not the roofer for Valcor at Redondo when I started in 2016.

Q. Understood. The current roofing vendor is Empire, correct?

A. That's who's the latest person that had been servicing the property, yes.

Q. Is there anyone in between Done Right and Empire that did any work on the roof at the property?

A. No, not that I can recall. It was just those two.

Q. Do you recall a roofing company called Fifth Wall doing any work at Redondo Place?

A. That very well may have been the roofer that was there when I started with Valcor in 2016. They may have been called at times to do work on the roof if they had already done work for warranty purposes. I don't recall reaching out to the Texas Fifth Wall. I recall reaching out the Texas Fifth Wall for properties, but it's been a while since I've reached out to them period, but not since -- not when I was managing the property did I reach out to Texas Fifth Wall.

Q. Okay. I'm going to introduce this as Exhibit Number 8 to the deposition.

Page 80

(Exhibit 8 was marked for identification.)

BY MR. SMITH:

Q. Can you see the document on my screen?

A. Yes.

Q. All right. The first page is a Done Right Services invoice to Tapout dated March 27th, 2019. The second is a May 11th, 2019, Done Right Services invoice to Wing Daddies. The third is a June 4th, 2019, invoice to Tapout. The fourth is a Done Right Services scope of work for roof repairs. The fifth is an October 23rd, 2019, roof repair invoice to Tapout. And the last is a November 10th, 2019, roof repair invoice to Tapout. Are these Done Right invoices documents that you provided to my firm in response to the subpoena?

A. Yes.

Q. How did you go about collecting these invoices from your files?

A. So these are the ones that I uploaded. The other invoice...

Q. Let me ask you this way. Is -- are these invoices kept in Valcor's files in the ordinary course of Valcor's business?

A. Yes.

Q. And are -- is this -- are these records, these

Page 81

invoices that we've marked as Exhibit A and that we looked at in Exhibit Number 2, the 2020 invoices, are those uploaded and stored in Valcor's files at the time that they're received from the vendors?
A. Yes.
Q. Okay. And are the invoices in Exhibit 2 the 2020 invoices, and these invoices here in Exhibit A, are they accurate copies of the invoices you received from these vendors?
A. Yes.
Q. And is it part of your job as an assistant property manager and a property manager to ensure that these invoices are kept in the ordinary course of business and stored in the files?
A. Yes.
Q. Okay. So for each of these invoices that we're looking at here in Exhibit Number 8, would these repairs have been done in response to a tenant complaint?
A. Without having to go back and look at correspondence back in 2019, I wasn't the property manager back then so I don't know if -- for instance this first one here, I don't know where it's -- you know, if Marie just had Jesse go out and do an inspection and that's how he found this or if the

Page 82

tenant called. I can't answer that truth -- I can't answer that. I don't know.
Q. Okay. Fair enough. When you were the property manager I think you testified that you never just had the roof vendor go out and look at the property, you only had the roof vendor go out when you were the property manager when there was an actual problem that was reported by a tenant; is that right?
A. When I was a property manager, if a tenant called in for a roof issue, I sent them a roofer. That's correct.
Q. Okay. And if the tenant -- if there was no tenant that had called in, you don't remember ever just sending out a roof vendor to do an inspection of the roof when there were no issues reported, do you?
A. For Redondo, I don't recall.
Q. And when you say Jesse, are you talking about -- if I scroll down to this October 29th, 2019, Done Right Services proposal in Exhibit Number 8, is that Jesse Sifuentes that I see here?
A. Yes, that's correct.
Q. And he is the owner of Done Right Services?
A. Yes, that's correct.
Q. Okay. And this says accepted by right here. Is this Marie Wilson's signature?

Page 83

A. Yes.
Q. I'll mark this as Exhibit 9 to the deposition.
(Exhibit 9 was marked for identification.)
BY MR. SMITH:
Q. Can you see the document on the screen?
A. Yes.
Q. Okay. And it is -- it's titled BBG Property Condition Assessment performed on Redondo Place prepared for Wells Fargo Bank, prepared by BBG Assessment, and the date issued is November 2nd, 2018. And there are Bates numbers in the corner here. It says Beka 000001. And if I scroll down through the report, it goes all the way to -- oops, Beka 000076. Do you recognize this document?
A. I don't think I've looked through the entire document. I think I just recognize the front page from it being sent for this particular purpose.
Q. Okay. And what purpose is that?
A. For a loan. All the requests for all the documents (indiscernible).
Q. Okay. So this -- did this document come from Valcor or did it come from the plaintiff?
A. Hold on a second. No, sorry. It might have just been something I had seen in the file, but it was not something that I sent. I have not sent that.

Page 84

Q. Okay, no problem. Have you seen this document before?
A. Maybe in just looking in the file, just if -- sometimes when --
Q. It's okay if you haven't. If you don't recognize it, it's totally fine. I'm just trying to figure out --
A. Yeah --
Q. -- if you know it.
A. It doesn't look familiar.
Q. Okay, fair enough. I'll represent to you that it is a property assessment that was conducted by this company, BBG Assessment, where they inspected Redondo Place on behalf of Wells Fargo in term -- in connection with the financing of the property. Now here on page Beka 000011, it lists the assessor Robyn Ludwick; it lists the date of the inspection as October 23rd and 30th, 2018; and it lists property escort as Mona Garcia and Priscilla Aguilar, the property management for Valcor. Do you see that?
A. Yes.
Q. Do you remember this inspection?
A. After reading the inaccessible area notes, I want to say that I do re -- I remember her visit.
Q. And I know it was a long time ago, but what do

Page 85

you remember about the inspection?
A. I remember her taking pictures of the vacants from the outside. She held up her camera like to the window. I assisted Priscilla because, you know, I was still not -- fairly new to Valcor but, you know, I was -- I liked -- I wanted to learn more, so I assisted Priscilla with doing a property inspection. I don't know if this was one of my first property inspections being with Valcor, so I wanted to see how an inspection went so that way in the future I could do them on my own.
And then typically we'd just walk around with the inspector and I think that's -- I mean, that's pretty much it. I don't think that there was anything -- I don't think there was anything significant. I mean, I do remember a couple of the suites the keys weren't working or something and she couldn't get inside. We had to get that issue addressed when we came back. I don't recall going back though. That may have just been Priscilla.
Q. Do you remember the inspector identifying or having any conversation with the inspector about roof leaks at the property?
A. No, not that I can recall. I'm trying to think of which tenants were in there back then in 2018

Page 86

to -- (indiscernible phrase). I don't recall like conversating with her about any particular unit that had leaks. I saw notes.
Q. You're on Page Beka 000014. It lists property owner, operator, or escort. It lists Mona Garcia, Priscilla Aguilar of Valcor. And then pertinent information says the property contacts provided general property information and stated that they were not aware of any fire, building, or other code violations. Management is aware of ongoing roof leaks which are addressed by Fifth Wall Roofing contractor. Do you see that?
A. Yes.
Q. Can you describe to me those ongoing roof leaks addressed by Fifth Wall?
A. I mean, not without looking at the invoices or proposals or anything, like I can't really pinpoint one specific --
Q. Fair enough.
A. -- document.
Q. Would those proposals or invoices exist in Valcor's files?
A. Yes, they should.
Q. Can you look for them right now?
A. What year was that?

Page 87

Q. 2018. This inspection was in October of 2018.
A. So it wouldn't be in -- let's see.
Q. And to help with that, if we look at Beka 000008 at the bottom of the page here it says: Evidence of roof leaks were noted and reported in several tenant spaces including Advanced Auto Parts, Wing Daddies, San Antonio shoe repair, Tapout Fitness, and Cosmic Mayhem, in addition to vacant suites 305 and 316.
A. So what is it specifically you're asking for? Like proposals --
Q. Yeah. Proposals or invoices from Fifth Wall Roofing for roof work that was done around that time.
A. I have -- yes.
Q. Okay.
A. I have -- yes. I have roof proposals, but I'm also looking in -- I have to get the code. Hold on one second. I don't recall if we had this particular management software back in 2018, so I don't know if we'll have the invoices like we do now because our software is different. But I could -- let me check.
So it looks -- well, hold on. Let me check on one of these to see if we have the actual invoice. Okay. And as far as I can tell, it looks like we would be able to get those.

Page 88

Q. You do have those invoices?
A. I mean, I'm not going through the entire listed, but I just click on one of them and it, you know...
Q. How many invoices are there on the list?
A. Well, let me redo the search, because I just customized it for -- do you want just for 2018?
Q. No. I'd like as far back as they go.
A. Okay. So let's do -- well, there's a lot. I mean not a lot, but -- oh, you know what? I could do this. Hold on one second. So I could do -- looks like 44 maybe.
Q. Okay. How far back do those invoices go?
A. The farthest one is 2017. But I -- yeah, 2017.
Q. Are there earlier invoices from a different roof vendor prior to 2017?
A. I have to search a different way because the only -- what I did right now is I searched Texas Fifth Wall and I --
Q. Okay.
A. -- my search options I put January 1 of 2015. I mean, if I went any further back -- I could go to 2012, which is when I think Valcor got started. Actually, I'll just do 2009 because that's when they

Page 89

got started. There's nothing. So it goes back to 2017. That's Texas Fifth Wall. So I'd have to go like -- I'd probably have to pull a GO for each year for roofing to give me the breakdown. And it was different vendors, and that's going to take -- that's going to be time consuming to do that.

Q. Okay. Well, let's do this. I have to say, you know, this is something -- these invoices are something that's important enough to us that I would like to get this sorted out. So the -- you know, we sent the subpoena to you requesting invoices for work done before the date of loss, after the date of loss about roofs -- about the roof and about the property. And, you know, I understand limiting it -- why you decided to limit it to 2019, but the fact is there weren't any objections made to this subpoena and documents were produced, but those others were withheld.

So, you know, my firm is going to want those documents and if they're -- you know, we hope that you'll cooperate and produce them. Is that something that you can do?

A. Like I said, I didn't gather the documents for the subpoena. I uploaded them to you guys. I can't speak as to why they weren't produced to you guys.

Page 90

I'm not going to speak for Priscilla. But you can send in your request on what additional documents you need and I can let her know.

Q. Well, I will. You know, the ones that she needed to search for, emails, other potential roof vendors, that I get. But these 44 that we're looking at right now I would like to get sorted out. Can you upload those to the same link that I already sent?

A. Send them to the same link you said?

Q. Yeah. We sent you a link that you could upload files directly --

A. Oh, yeah.

Q. -- to us.

A. The one that you sent me earlier?

Q. Correct.

A. Yes. It's going to be time consuming because I can't just send this, I have to send each individual one I believe. I don't think that I can -- I don't think. I'd have to ask accounting. I don't -- there might be a way that I could send them like this when the invoice is already attached. I'm not 100 percent sure. That's kind of like something accounting would do, but I can find out.

Q. Okay. Will you figure out how you'll produce those?

Page 91

A. Yes.

Q. And if it's going to be too time consuming, and we can get your agreement to produce them on the record, you know, then we can move on. But I would like to get to the bottom of it today.

A. Okay.

Q. Okay. We can take a little break to sort that out as well. Five or ten minutes, whatever you need.

A. Okay.

THE VIDEOGRAPHER: We are now off the record. The time is 1:49 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:10 p.m.

BY MR. SMITH:

Q. Ms. Garcia, were you able to track down those invoices?

A. So what I was going to tell you guys is that we're going to need everything that you are requesting in writing so that we can check with our counsel as well. We're the only ones here without counsel right now, so we just want to make sure that we can give out this information.

Q. Okay. Well, you do understand that we submitted the subpoena to you that requests all

Page 92

invoices related to repairs to the property in your possession, correct?

A. I'm just asking if you can just send me what you need -- what additional items you need in writing.

Q. And I will send it. But I am asking you if you understand that our subpoena to your -- to Valcor requests all invoices related to repairs for the property.

A. And we submitted those to you.

Q. Did you submit all of the invoices related to roof repairs to the property to us?

A. The invoices that we had in our possession, yes.

Q. So are these 44 invoices from Fifth Wall Roofing, are those not in your possession?

A. Not in my possession, no.

Q. Whose possession are they in?

A. They're going the be in the ownership's possession, previous ownership's possession.

Q. Did you just look them up on your computer?

A. I wasn't looking correctly.

Q. Didn't you just say that you accessed those invoices?

A. I wasn't looking correctly.

Q. What were you looking at?

Page 93

MS. AGUILAR: Hi, I'm Priscilla. And I'm just going to let you guys know we need to talk to our counsel now that you're asking for stuff that belongs to a different owner. The very little that we do have, I don't know that we're able to share that. So we do need to consult with our counsel first and we'll have to resume later. Can you send us in writing --

MR. LANGLEY: Can we go off the record? I think we should go off the record as well.

THE VIDEOGRAPHER: We are now off the record. The time is 2:12 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:33 p.m.

MR. SMITH: Before the last break we -- Ms. Garcia was accessing some documents on her computer. I asked for those to be provided to us as they were responsive to the subpoena, the invoices of repairs before the date of loss to the property. We took a break for her to figure out how those documents could possibly be produced. When we got back on the record, Ms. Garcia then stated that the documents did not belong to her and that they belonged to their client, and another member of Valcor appeared on the deposition named Priscilla Aguilar, who stated that

Page 94

they would -- they refused to produce these documents until we provided them a list of exactly what documents we wanted and they ran it by their counsel.

At that point, we went off the record. We discussed that I would send them the list that they demanded and they disconnected from the Zoom without warning. I attempted to call them repeatedly to try to get Ms. Garcia to reappear to complete the deposition but was told by someone else from their office that they were unavailable and would not be returning to complete the deposition. So I would like to continue the deposition at this point in time.

MR. LANGLEY: This is Jacob Langley, counsel for plaintiff, Beka One, LLC. Wanted to state on the record that the witness was not passed by defense counsel as the deposition had not been completed. Therefore, plaintiff's attorney was not able to ask my questions to the deponent, Ms. Garcia. Plaintiff's attorney would request that this deposition be continued so that counsel for plaintiff has -- is afforded the opportunity to depose the witness.

THE VIDEOGRAPHER: Okay. Before we go off the record, Mr. Langley, would you like a copy of the video or transcript today?

MR. LANGLEY: I'd like a copy of the

Page 95

transcript, please.

THE VIDEOGRAPHER: And how would you like that?

MR. LANGLEY: E-tran is fine.

THE VIDEOGRAPHER: Thank you. And Mr. Smith?

MR. SMITH: Yes. I would like a copy of the video and transcript, please.

THE VIDEOGRAPHER: And do you have a standing order with Esquire?

MR. SMITH: Yes. But I would like to get it expedited as soon as possible.

THE VIDEOGRAPHER: As soon as possible. Okay. And for your video, would you just like standard mp4?

MR. SMITH: That's -- yeah, that's fine.

THE VIDEOGRAPHER: And transcript?

MR. SMITH: I just -- I need an electronic copy that I can search through.

THE VIDEOGRAPHER: Thank you. We are now off the record. The time is 2:36 p.m.

(The deposition concluded at 2:37 p.m.)

Page 96

CHANGES AND SIGNATURE

WITNESS NAME: MONA INEZ GARCIA

ESQUIRE JOB NO. J10410101

DATE OF PROCEEDING: October 24, 2023

PAGE, LINE CHANGE REASON

_______________________________________________

I, MONA INEZ GARCIA, have read the foregoing transcript and hereby affix my signature that same is true and correct, except as noted on the previous page.

____________________
MONA INEZ GARCIA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

Before me,__________________, on this day personally appeared MONA INEZ GARCIA, known to me (or proved to me under oath or through ______________)to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of _____________, 2023.

Candice Edwards
_________________________
Notary Public in and for
the State of Texas



UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

BEKA ONE, LLC, )
)
Plaintiff, )
) CIVIL ACTION NO.
vs. ) 5:23-cv-64
)
RLI INSURANCE COMPANY, )
)
Defendant. )

REPORTER'S CERTIFICATE

DEPOSITION OF MONA INEZ GARCIA

OCTOBER 24, 2023

I, CANDICE EDWARDS, Digital Reporter and Notary Public for the State of Texas, hereby certify to the following:

That the witness, MONA INEZ GARCIA was duly sworn by me and that the testimony was accurately captured with annotations by me during the proceeding;

That the transcript was submitted on___________, 2023, to the witness or to the attorney for the witness for examination, signature, and returned to me by ______________, 2023;

That the amount of time used by each party at the proceeding was as follows:

Defendant - 186 MIN

That $________is the proceeding officer's charges to Counsel for preparing the original proceeding transcript and any copies of exhibits;

That pursuant to information given to the proceeding officer at the time said testimony was taken, the following includes counsel for all parties of record:



JACOB LANGLEY, ESQ., Attorney for Plaintiff
RICHARD LEE SMITH, ESQ., Attorney for Defendant

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to 203 of TRCP will be certified to after they have occurred.

Certified to by me this 26th day of October 2023.

Candice Edwards
________________________________
CANDICE EDWARDS
Notary Commission Texas
133142106
Commission Expires: 6/7/2025
Firm Registration No. 3



FURTHER CERTIFICATION UNDER RULE 203 TCRP

The original proceeding was/was not returned to the proceeding officer on ___________________.

If returned, the attached Change and Signature page contains any changes and the reasons therefor.

If returned, the original proceeding transcript was delivered to Richard Lee Smith, Esq., Custodial Attorney.

That $_______ is the proceeding officer's charges to the custodial party for preparing the original proceeding transcript and any copies of exhibits.

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on ________________ and files with the Clerk.

Certified to by me this 26th day of October 2023.

Candice Edwards
____________________________
CANDICE EDWARDS
Notary Commission Texas.
133142106
Commission Expires: 6/7/2025
Firm Registration No. 3

CERTIFICATE OF TRANSCRIPTIONIST

I, EMILY ATIGA, Legal Transcriptionist, do hereby certify:

That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter. As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 26th day of October 2023.

EMILY ATIGA